## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
## GREENEVILLE DIVISION

JOSHUA GIBBONS,

     *Plaintiff,*

  v.

CITY OF KINGSPORT, a political
subdivision of the State of Tennessee;

DALE PHIPPS, the Chief of the City of
Kingsport Police Department, in his
individual capacity;

JASON BELLAMY, Deputy Chief of the
City of Kingsport Police Department, in
his individual capacity;

SEAN CHAMBERS, Commander of the
City of Kingsport Police Department, in
his individual capacity;

MARTIN TAYLOR, a Lieutenant of the
Kingsport Police Department, in his
individual capacity;

DARELL JOHNSON, a Lieutenant of
the Kingsport Police Department, in his
individual capacity;

ROBERT MILLS, a Detective of the City
of Kingsport Police Department, in his
individual capacity; and

DANIEL HORNE, a Sergeant Detective
of the City of Kingsport Police
Department, in his individual capacity

     *Defendants.*

CIVIL ACTION NO.: 2:23-CV-00138

**COMPLAINT FOR
CIVIL-RIGHTS VIOLATIONS**

**JURY TRIAL DEMANDED**

1

## INTRODUCTION

1. Joshua Gibbons—who frequently films Kingsport police—embarrassed the Kingsport Police Department by posting videos of officers' conduct: a uniformed officer displaying the middle finger, another speeding in a Department SUV. The Department—with the blessing of its senior leadership—responded with a predawn raid on Gibbons's home. At 5:00 a.m., a phalanx of eight armed officers in tactical vests marched to Gibbons's residence, barreled past his elderly mother, and roused Gibbons from bed, hauling him half-dressed to jail.

2. The Kingsport officers' actions stemmed from Gibbons's YouTube video showing a uniformed Kingsport officer displaying the middle finger.

3. When the public began to complain about the officer's one-finger salute, Kingsport police scoured Gibbons's YouTube videos, hunting for some—*any*—basis to arrest him.

4. A few hours after the Department's leadership was apprised of the embarrassing video, a Kingsport detective was "made aware" of a separate video of a Kingsport Police SUV speeding without lights or sirens to a fast-food drive-thru— where Gibbons briefly criticized the law-enforcement officer for disregarding the legal speed limit.

5. Kingsport police seized upon Gibbons's video of their lead-footed colleague to accuse Gibbons of speeding, unlawful use of a cell phone, and disorderly conduct for criticizing the officer.

6. At dawn the following morning, Kingsport police raided Gibbons's home.

2

7. This retaliatory overreaction by Kingsport police was a deliberate choice by Chief Phipps and numerous other officers in the chain of command to send Gibbons a message: Stop filming us and shut up.

8. To send that message, Kingsport police ignored state law prohibiting arrests for minor traffic offenses, and disregarded well-established law that verbal criticism of police officers is an American tradition, not a crime.

9. The First Amendment forbids state actors from jailing their detractors, just as it protects the right to film police, to post videos online, and to criticize police officers, online or offline.

## JURISDICTION AND VENUE

10. This action arises under the First, Fourth, and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02.

11. This Court has jurisdiction over the federal claims asserted under 28 U.S.C. §§ 1331 and 1343.

12. Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) because the City of Kingsport resides in this district, the Plaintiff resides in this district, and, on information and belief, the individual defendants reside in the State of Tennessee.

13. Venue is also proper in this Court under 28 U.S.C. § 1391(b)(2) because the events giving rise to Plaintiff's claims occurred in Sullivan County, which is located in the Greeneville Division of the Eastern District of Tennessee.

## THE PARTIES

14. Plaintiff Joshua Gibbons is a resident of Sullivan County, Tennessee. Gibbons frequently films law-enforcement officers when they are conducting public business in public places. In doing so, Gibbons is among the many who use their cell phone cameras to hold government officials to account. And like many, Gibbons posts his recordings online: Gibbons, under the pseudonymous moniker "Big G Audits," posts recordings on YouTube that are sometimes critical of law-enforcement officers. For posting videos that embarrassed the Kingsport Police Department, Kingsport police raided his residence at 5:00 a.m., arrested him half-dressed, and locked him up in the county jail.

15. Defendant City of Kingsport is a municipality organized under the laws of the State of Tennessee. Defendant City of Kingsport is subject to liability under 42 U.S.C. § 1983. *See, e.g.*, *Penbaur v. City of Cincinnati*, 475 U.S. 469 (1986); *Monell v. Dep't of Soc. Servs. of the City of N.Y.*, 436 U.S. 658 (1978).

16. Defendant Dale Phipps is the Chief of Police for the Kingsport Police Department. Chief Phipps was aware of and sanctioned the actions taken against Gibbons in retaliation for embarrassing the Department and its officers. At all times relevant to the Complaint, Defendant Phipps acted under the color of law. He is sued in his individual capacity.

17. As Chief of Police, Phipps is endowed by the City of Kingsport's charter with the authority "to preserve order in the city" through "perform[ing] a general police duty." Charter of the City of Kingsport, Art. XVII, § 2.

4

18.     By ordinance, the City of Kingsport also delegates to Chief Phipps the authority to prescribe any "rules and regulations" he deems appropriate for the Kingsport Police Department. City of Kingsport Code of Ordinances, § 50-20.

19.     On behalf of the City of Kingsport, Chief Phipps writes and promulgates policies for the Kingsport Police Department, including general orders, and is the City of Kingsport's final decisionmaker on law-enforcement matters.

20.     Defendant Jason Bellamy is the Deputy Chief of Police for the Kingsport Police Department. Deputy Chief Bellamy is the second in command of the Kingsport Police Department. Deputy Chief Bellamy was aware of and sanctioned the actions taken against Gibbons in retaliation for embarrassing the Department and its officers. At all times relevant to the Complaint, Defendant Deputy Chief Bellamy acted under the color of law. He is sued in his individual capacity.

21.     Defendant Sean Chambers is Commander of the Kingsport Police Department. As Commander, Chambers oversees the Kingsport Police Department's Operations Bureau, including its Criminal Investigation Division. Commander Chambers was aware of and sanctioned the actions taken against Gibbons in retaliation for embarrassing the Department and its officers. At all times relevant to the Complaint, Defendant Commander Chambers acted under the color of law. He is sued in his individual capacity.

22.     Defendant Martin Taylor is a Lieutenant of the Kingsport Police Department. Lieutenant Taylor is the Criminal Investigation Division Commander and oversees the Department's detectives. On information and belief, Defendant

Lieutenant Taylor participated in, was aware of, and sanctioned the actions taken against Gibbons in retaliation for embarrassing the Department and its officers. At all times relevant to the Complaint, Defendant Lieutenant Taylor acted under the color of law. He is sued in his individual capacity.

23. Defendant Darell Johnson is a Lieutenant of the Kingsport Police Department. On information and belief, Defendant Lieutenant Johnson participated in, was aware of, and sanctioned the actions taken against Gibbons in retaliation for embarrassing the Department and its officers. At all times relevant to the Complaint, Defendant Lieutenant Johnson acted under the color of law. He is sued in his individual capacity.

24. Defendant Detective Robert Mills is a police officer with the Kingsport Police Department. Det. Mills was responsible for procuring a warrant for Gibbons's arrest and initiating criminal proceedings against Gibbons immediately after learning of videos Gibbons posted that embarrassed the Department and its officers. At all times relevant to the Complaint, Defendant Det. Mills acted under the color of law. He is sued in his individual capacity.

25. Defendant Detective Sergeant Daniel Horne is a police officer with the Kingsport Police Department. Det. Sgt. Horne implemented the plan to arrest Gibbons. At all times relevant to the Complaint, Defendant Horne acted under the color of law. He is sued in his individual capacity.

26. Defendants Phipps, Bellamy, Chambers, Taylor, Johnson, Mills, and Horne are collectively referred to as the "Individual Defendants."

6

## FACTUAL ALLEGATIONS

27.     As cell phone cameras have become ubiquitous, people increasingly use them to record the public actions of police officers, providing an important check against abuses of authority or misconduct by law-enforcement officers. Some use them to record their own interactions with police, or to record others' interactions with police, or to document the world around them.

28.     Gibbons is among them. Adopting the pseudonymous moniker "Big G Audits," he records his local police and posts these videos to YouTube.

### *A fast-food restaurant and a faster Kingsport Police SUV.*

29.     Late in the night of October 9, 2022, Sergeant Craig Dunworth was on duty, driving a marked Kingsport Police Department SUV.

30.     Kingsport Police Department General Order No. 510.1 requires officers to operate police vehicles in "strict accordance" with Tennessee state law.

31.     Tennessee state law permits an officer to exceed posted speed limits only when responding to an emergency call and only when using lights and sirens. Tenn. Code Ann. § 55-8-108(a), (b), & (c)(1).

32.     The Kingsport Police Department's own policies reflect the same: Officers not responding to an emergency must adhere to "all traffic laws," and those responding to an emergency must use lights and sirens if they are to exceed posted speed limits. Kingsport Police Department General Order No. 510.1.

33.     Sgt. Dunworth drove his police SUV in excess of the posted speed limit without using emergency lights or sirens.

34. Sgt. Dunworth ultimately arrived at the drive-thru line of Cook Out, a fast-food hamburger restaurant in a commercial area adjacent to a busy street.

35. As Sgt. Dunworth was waiting in line to place an order, Gibbons walked up to the Kingsport Police Department vehicle and asked Sgt. Dunworth for his badge number.

36. Gibbons briefly and quietly criticized Sgt. Dunworth for speeding.

37. When Sgt. Dunworth refused to identify himself, Gibbons said he would submit a formal complaint to the Kingsport Police Department and began to walk away.

38. After walking about fifteen feet from Sgt. Dunworth's vehicle, Gibbons spoke to Sgt. Dunworth, saying: "I don't know why you feel you're above the law. You have to obey by the traffic laws just like everybody else when you're not running emergency. Why you think you can do 55 miles an hour down Stone Drive, I have no idea, you piece of shit."

39. Gibbons continued walking away without further incident or exchange.

40. The exchange between Gibbons and Sgt. Dunworth lasted 62 seconds.

41. Sgt. Dunworth was not prevented from ordering his meal.

42. The patrons in the vehicle ahead of Sgt. Dunworth—themselves both off-duty law-enforcement officers—were not prevented from ordering their meals.

43. Gibbons's brief conversation with Sgt. Dunworth did not amount to unreasonable noise in the context of a commercial area adjacent to a noisy street.

44. Sgt. Dunworth did not ask Gibbons to lower his voice.

45. Sgt. Dunworth did not exit his vehicle.

46. Sgt. Dunworth did not view Gibbons as a threat.

47. Sgt. Dunworth did not file a written report about the encounter.

48. In sum, Sgt. Dunworth did not treat the encounter as disorderly conduct.

49. Instead, Sgt. Dunworth later informed a supervisor, Defendant Lt. Darrell Johnson, that a citizen had complained about him, treating it as a complaint—not a crime.

50. Sgt. Dunworth was not disciplined, reprimanded, cited, or arrested for speeding in violation of state law and Kingsport Police Department policy.

51. Instead, Defendant Lt. Johnson sent an email at 6:07 a.m. on the morning of October 11, 2022, warning officers on the day shift that "'Big G' 1st Amendment Audits is Stalking KPD. Watch your speed, he will approach you, watch your back and each other."

***Kingsport police officers scour Gibbons's YouTube channel after receiving complaints about officer misconduct shown in a Gibbons video.***

52. Nobody—not Sgt. Dunworth, nor Defendant Lt. Johnson, nor the off-duty officers who witnessed the encounter—treated Gibbons's criticism of Sgt. Dunworth as a criminal act until *after* they received complaints about Gibbons's unrelated video on YouTube embarrassing the Department and its officers.

53. Gibbons's video of the Sgt. Dunworth encounter was posted on the night of October 10, 2022, but received little attention.

9

54.     On October 15, 2022, Gibbons posted a second YouTube video in which Officer Kin Ho of the Kingsport Police Department displayed his middle finger to Gibbons.

55.     The following morning, a member of the public submitted a complaint to the Kingsport Police Department about the conduct of Officer Ho.

56.     The complaint contained a link to Gibbons's YouTube video depicting Officer Ho displaying his middle finger to Gibbons.

57.     The complainant said Officer Ho's conduct was "petty and juvenile" and "needs to be dealt with," as "[p]olice should be better than what was displayed."

58.     The complainant warned that the video of Officer Ho's conduct was "now spreading over the internet."

59.     After the Kingsport Police Department's Public Information Officer began circulating the Officer Ho video internally on October 17, 2022, Defendant Lt. Darell Johnson brought it to the attention of a commanding officer, describing it in an email as the "Big G Audit Video."

60.     On information and belief, Defendants Lt. Johnson and Lt. Taylor had previously met to discuss how to respond to Gibbons's filming of officers.

61.     The commanding officer forwarded Defendant Lt. Johnson's email about the Officer Ho video to Defendants Chief Dale Phipps, Deputy Chief Jason Bellamy, and Commander Sean Chambers.

62.     Within two hours of the email alerting Chief Phipps, Deputy Chief Bellamy, and Commander Chambers to the embarrassing Officer Ho video, one or

more of the other Individual Defendants provided Defendant Det. Robert Mills with the Sgt. Dunworth video at 2:00 p.m. on October 17, 2022.

63. Det. Mills otherwise had no reason to investigate Gibbons.

64. Det. Mills wrote in a subsequent report and in a subsequent that he was "made aware" of the video.

65. On information and belief, Det. Mills was "made aware" of the Sgt. Dunworth video as a result of the other Individual Defendants' agreement to retaliate against Gibbons.

66. Defendant Det. Mills's report alleged that the "Big G Audits" video depicted Gibbons "operating his hand held cellphone while driving and filming," that the video "shows himself traveling 53 MPH in a posted 45 MPH zone," and that the video depicts Gibbons "yelling obscenities at the Officer and disturbing the lawful conduct of the Officer and other patrons that are in the drive-thru."

67. Defendant Det. Mills wrote that based on these allegations, he was charging Gibbons with speeding, unlawful use of a cell phone, and disorderly conduct.

68. At 2:18 p.m., just eighteen minutes after Det. Mills was "made aware" of Gibbons's video of Sgt. Dunworth, Defendant Det. Daniel Horne sent an email to the Department's command—including Defendants Chief Phipps, Deputy Chief Bellamy, and Lieutenant (and Criminal Investigation Division Commander) Martin Taylor—informing them that Det. Mills would obtain a warrant for Gibbons' arrest "forthwith."

11

69. Defendants Chief Phipps, Deputy Chief Bellamy, Commander Chambers, Det. Horne, Lieutenant Taylor, and Lieutenant Johnson knew of the plan to retaliate against Gibbons in violation of his constitutional rights.

70. Defendants Chief Phipps, Deputy Chief Bellamy, Commander Chambers, Det. Horne, Lieutenant Taylor, and Lieutenant Johnson, deliberately indifferent to Gibbons's rights, sanctioned Kingsport police's unlawful arrest and jailing of Gibbons.

71. In applying for a warrant for Gibbons's arrest, Defendant Det. Mills submitted a sworn affidavit to the Sullivan County Circuit Court Clerk.

72. Tennessee's disorderly conduct statute prohibits conduct that "prevents" others from "lawful conduct."

73. Det. Mills knew that Gibbons's minute-long criticism of Sgt. Dunworth had not prevented any "lawful conduct" by Sgt. Dunworth or any other person.

74. Defendant Det. Mills' sworn affidavit instead stated that Gibbons was "disturbing the lawful conduct" of Sgt. Dunworth and "other patrons."

75. On the basis of Det. Mills' affidavit, a clerk of the Sullivan County Circuit Court—not a judge or magistrate—issued a warrant for Gibbons's arrest for speeding, use of a cell phone while driving, and disorderly conduct.

76. At 4:03 p.m., less than two hours after Defendant Det. Mills was "made aware" of the Sgt. Dunworth video, Det. Mills sent an email to an all-officer Department listserv alerting them that he had "obtained an arrest warrant for Josh Gibbons, AKA 'Big G Audits.'"

***Kingsport police officers arrest Gibbons in a pre-dawn raid of his mother's home.***

77.    At 5:00 a.m. on October 18, 2022—just fifteen hours after Det. Mills first learned of the Sgt. Dunworth video—eight armed police officers, in formation, approached the home of Gibbons's elderly mother.

78.    Gibbons's home-surveillance camera shows officers splitting into two groups as they approach the house, and records the sound of an officer cocking a long-barrel shotgun.

79.    Gibbons's elderly mother woke to the sound of officers pounding on her door.

80.    When she answered the door, the officers announced that they had a warrant for Gibbons's arrest, entered the home, roused a half-dressed Gibbons from his bed, and placed him in handcuffs.

81.    Gibbons's daughter, awoken by the racket, filmed some of her father's arrest on her cell phone.

82.    The officers removed Gibbons from the home, refusing to permit him to fully dress himself, and placed him in the back of a Kingsport police vehicle.

83.    Gibbons was transported to the Kingsport City Jail and held until his arraignment later that morning.

84.    Gibbons was charged with two traffic offenses—speeding in violation of Tenn. Code. Ann. § 55-8-152 and unlawful use of a telecommunications device in violation of Tenn. Code. Ann. § 55-8-199—as well as disorderly conduct in violation of Tenn. Code. Ann. § 39-17-305.

85.     Gibbons was then transferred to the Sullivan County jail, where he was imprisoned until posting a $1,250 bond that afternoon.

***The speeding and cell phone charges against Gibbons are dismissed, but the disorderly conduct charge remains pending.***

86.     On February 23, 2023, Gibbons appeared in Sullivan County General Sessions Court.

87.     The court dismissed the speeding charge and unlawful use of telecommunications device charge.

88.     At the conclusion of the initial trial, Gibbons was convicted of disorderly conduct on the basis that the judge was "offended by the way" Gibbons "was talking to that officer."

89.     Gibbons was sentenced to ten days in jail and ordered to pay a $10.00 fine.

90.     Gibbons has since appealed his conviction to the Sullivan County Circuit Court.

91.     The disorderly conduct charge is currently awaiting a *de novo* trial before the Sullivan County Circuit Court.

## INJURIES TO PLAINTIFF

92.     The retaliatory actions taken by Kingsport police officials and officers have injured Gibbons, and these injuries continue to mount as Kingsport persists in prosecuting Gibbons for expressive activity protected by the First Amendment.

93.     Gibbons's injuries include being forcibly detained, handcuffed, transported, and confined to a county jail as a result of his protected expression.

94.    Purposefully adding insult to injury, Kingsport police elected not to issue a ticket and criminal summons to Gibbons, but deliberately chose to arrest him in his home at 5:00 a.m. in front of his elderly mother and his daughter.

95.    In addition to the deliberate chilling effects on his protected expression, Gibbons was required to post $1,250 in bond to be released from incarceration pending trial.

96.    For over a year, Gibbons's future has been placed in limbo. When his *de novo* trial is completed, Gibbons will have twice been subject to prosecution and twice tried for criticizing a law-enforcement officer's violation of the legal speed limit. As such, Gibbons will have been subjected to a long period of pending charges and fear of incarceration.

## FIRST CAUSE OF ACTION
### First Amendment Retaliation
### (42 U.S.C. § 1983)
### (Against All Defendants)

97.    Gibbons re-alleges and incorporates paragraphs 1–96 as if repeated here.

98.    Gibbons engaged in multiple forms of expressive activity, including:

    a.    Videorecording on-duty police officers in public places, including Officer Ho and Sgt. Dunworth;

    b.    Posting videos critical of Kingsport police on YouTube; and

    c.    Criticizing the conduct of Kingsport police officers, including Sgt. Dunworth.

99.    It clearly established law that the First Amendment protects the right to film police officers. *See Irizarry v. Yehia*, 38 F.4th 1282, 1290–94 (10th Cir. 2022)

(surveying circuit decisions and holding the right to record police performing duties in public "was clearly established . . . based on the persuasive authority from six other circuits, which places the constitutional question 'beyond debate'").

100.     It is clearly established law that the First Amendment protects the right to post information on social media. *Packingham v. North Carolina*, 582 U.S. 98, 104 (2017).

101.     It is clearly established law that the First Amendment protects "verbal criticism and challenge directed at police officers." *Houston v. Hill*, 482 U.S. 451, 461–62 (1987).

102.     Gibbons's exercise of his First Amendment rights—including his criticism, filming, and verbal criticism of Kingsport police officers—was a motivating factor in the conduct by the Individual Defendants, including their deliberate choice to obtain a warrant for Gibbons's arrest.

103.     The Individual Defendants' actions would be sufficient to deter a person of ordinary firmness from continuing to exercise their First Amendment rights. These actions included:

     a.    Electing to obtain a warrant for Gibbons's arrest;

     b.    Causing armed police officers to enter Gibbons's residence without consent before dawn;

     c.    Causing police to handcuff Gibbons in front of his mother and daughter;

     d.    Causing police to forcibly transport and jail Gibbons; and

     e.    Causing the initiation of repeated criminal proceedings against Gibbons.

104.   As a direct and proximate cause of the Individual Defendants' unlawful acts, as alleged herein, Gibbons has been deprived of his rights under the First Amendment to the United States Constitution.

105.   The Individual Defendants' retaliatory conduct entitles Gibbons to declaratory relief and compensatory damages, including at least nominal damages.

106.   It is clearly established law that the First Amendment prohibits any individual acting under the color of state law from retaliating against a speaker based on expression protected by the First Amendment.

107.   Defendants did not have probable cause to arrest Gibbons for disorderly conduct.

108.   It is clearly established law that a First Amendment retaliatory arrest claim will lie "where officers have probable cause to make arrests, but typically exercise their discretion not to do so." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1727 (2019).

109.   When exercising their discretion, police typically do not enforce minor speeding or cell-phone traffic offenses by criminal summons.

110.   Tennessee state law deprives police officers of any discretion to enforce minor traffic offenses, including speeding and unlawful use of a telecommunications device, through arrest, except in narrow circumstances not applicable here. Tenn. Code Ann. § 55-10-207(a)(1).

111.   Tennessee state law provides that police officers always have the ability to seek a summons in lieu of an arrest warrant. Tenn. Code Ann. § 40-6-215(a)(1).

112. Kingsport Police Department General Order No. 520.2 encourages enforcement of traffic offenses through citation as "the most preferred response," and arrests are only "appropriate" for offenses involving a "serious life threatening offense (such as D.U.I., hit and run, etc.)," or in narrow circumstances not applicable here.

113. Kingsport Police Department General Order No. 520.2 requires that "[a]ll action taken (warnings, citations, arrests) shall be in accordance with state law," including "specifically" Tennessee Code Annotated section 55-10-207.

114. On information and belief, Kingsport police have never sought an arrest warrant for a speeding or cell-phone offense, save for one instance in which the driver fled the scene.

115. At the time of Gibbons's arrest, a reasonable police officer or official with the same information available could not have believed that:

    a.    Gibbons's filming of Kingsport police was unprotected by the First Amendment;

    b.    Gibbons's posting videos critical of Kingsport police was unprotected by the First Amendment;

    c.    Gibbons's verbal criticism of Sgt. Dunworth was unprotected by the First Amendment;

    d.    Gibbons's verbal criticism of Sgt. Dunworth was disorderly conduct;

    e.    There was probable cause to arrest Gibbons; or that

    f.    There was probable cause to incarcerate Gibbons.

116. The Individual Defendants knowingly and willfully harassed, intimidated, interfered with, and arrested Gibbons with a reckless and callous disregard for, and deliberate indifference to, his First Amendment rights.

117.    Because the Individual Defendants' retaliatory actions were malicious, oppressive, and in reckless disregard of Gibbons's clearly established First Amendment rights, Gibbons is entitled to punitive damages against the Individual Defendants.

118.    Defendant Chief Phipps is the final policymaker with respect to the Kingsport Police Department. *See* ¶¶ 16–19, *supra.*

119.    Municipal liability can attach under *Monell*, 436 U.S. 658, for decisions made by a final policymaker. *See Pembaur v. City of Cincinnati,* 475 U.S. 469, 481 (1986).

120.    Defendant Chief Phipps was aware of and sanctioned the actions taken against Gibbons in retaliation for his protected expression.

121.    Defendant City of Kingsport is liable for the Individual Defendants' retaliatory conduct, entitling Gibbons to declaratory relief and compensatory damages, including at least nominal damages, against the City of Kingsport.

## SECOND CAUSE OF ACTION
### As-Applied First Amendment Challenge to Disorderly Conduct Statute
### (42 U.S.C. § 1983)
### (Against All Defendants)

122.    Gibbons re-alleges and incorporates paragraphs 1–96 as if repeated here.

123.    Gibbons's criticism of Sgt. Dunworth was protected by the First Amendment.

124. The Individual Defendants lacked probable cause or arguable probable cause for Gibbons's arrest for disorderly conduct for his 65-second encounter with Sgt. Dunworth.

125. Disorderly conduct is defined by Tennessee statute and narrowly limited to "fighting or . . . violent or threatening behavior"; creating "a hazardous or physically offensive condition. . . ."; or making "unreasonable noise that prevents others from carrying on lawful activities."

126. Gibbons did not engage in fighting, violence, or threatening behavior.

127. Gibbons did not create a "hazardous or physically offensive condition."

128. Gibbons did not make noise unreasonable to a commercial area adjacent to a noisy street.

129. Gibbons's speech did not prevent anyone from carrying on any lawful activity.

130. For example, Gibbons's interaction with Sgt. Dunworth did not prevent other patrons from waiting in line, putting in orders, and receiving their meals.

131. It is also clearly established that disorderly conduct prohibitions are narrowly circumscribed by the First Amendment. *See, e.g.*, *Kennedy v. City of Villa Hills*, 635 F.3d 210, 216 (6th Cir. 2011).

132. Gibbons's verbal criticism of Sgt. Dunworth did not meet the letter of Tennessee's disorderly conduct statute, as evidenced by Sgt. Dunworth's inaction during or after the encounter.

133. The Individual Defendants nevertheless applied Tennessee's disorderly conduct statute to Gibbons without probable cause.

134. The Individual Defendants improperly utilized Tennessee's disorderly conduct statute to Gibbons as a means of falsely obtaining an arrest warrant, as Tennessee state law prohibited them from arresting Gibbons for speeding or unlawful use of a cell phone.

135. The Individual Defendants improperly applied Tennessee's disorderly conduct statute to Gibbons to penalize him for his criticism and filming of Kingsport police.

136. The Individual Defendants' improper application of Tennessee's disorderly conduct statute entitles Gibbons to declaratory relief and compensatory damages, including at least nominal damages.

137. At the time of Gibbons's arrest, a reasonable police officer or official with the same information available could not have believed that:

    a. Gibbons's verbal criticism of Sgt. Dunworth was unprotected by the First Amendment;

    b. Gibbons's verbal criticism of Sgt. Dunworth was disorderly conduct;

    c. There was probable cause to arrest Gibbons; or that

    d. There was probable cause to incarcerate Gibbons.

138. Because the Individual Defendants' actions were malicious, oppressive, and in reckless disregard of Gibbons's clearly established First Amendment rights, Gibbons is entitled to punitive damages against the Individual Defendants.

139. Defendant Chief Phipps is the final policymaker with respect to the Kingsport Police Department. *See* ¶¶ 16–19, *supra.*

140. Municipal liability can attach under *Monell*, 436 U.S. 658, for decisions made by a final policymaker. *See Pembaur v. City of Cincinnati,* 475 U.S. 469, 481 (1986).

141. Defendant Chief Phipps was aware of and sanctioned the actions taken against Gibbons in retaliation for his protected expression.

142. Defendant City of Kingsport is liable for the Individual Defendants' retaliatory conduct, entitling Gibbons to declaratory relief and compensatory damages, including at least nominal damages, against the City of Kingsport.

### THIRD CAUSE OF ACTION
### Violation of Fourth Amendment—
### Unlawful Seizure and False Arrest (42 U.S.C. § 1983)
### (Against All Defendants)

143. Gibbons re-alleges and incorporates paragraphs 1–96 as if repeated here.

144. Defendants Chief Phipps, Deputy Chief Bellamy, Det. Horne, and Det. Mills brought about the unlawful arrest of Gibbons.

145. Det. Mills signed an affidavit seeking a warrant for Gibbons's arrest.

146. Defendants Chief Phipps and Deputy Chief Bellamy, Det. Mills's supervisors, knew or should have known that Det. Mills was seeking a warrant without probable cause.

147. In his affidavit, Det. Mills sought to charge Gibbons with two traffic offenses—speeding in violation of Tenn. Code. Ann. § 55-8-152 and unlawful use of a

telecommunications device in violation of Tenn. Code. Ann. § 55-8-199—as well as disorderly conduct in violation of Tenn. Code. Ann. § 39-17-305.

148.    Det. Mills knew, or should have known, that Tennessee state law and Department policies require citations, and not arrests, for violations of Tenn. Code. Ann. §§ 55-8-152 and 55-8-199.

149.    Chief Phipps, Deputy Chief Bellamy, and Det. Horne knew or should have known that Det. Mills sought a warrant for Gibbons's arrest predicated on charges that require citation and release and not a custodial arrest.

150.    Furthermore, Det. Mills knew that Gibbons's words to Sgt. Dunworth at the drive-thru constituted speech protected by the First Amendment.

151.    Det. Mills knew that Gibbons's words to Sgt. Dunworth did not prevent the lawful activity of Sgt. Dunworth.

152.    Det. Mills knew that Gibbons's criticism of Sgt. Dunworth at the drive-thru did not prevent the lawful activity of the other patrons waiting in line.

153.    In fact, Det. Mills's affidavit in support of the arrest warrant alleged that Gibbons "disturbed" the lawful conduct of others, diverting from the language of Tennessee's disorderly conduct statute, which prohibits conduct that "*prevents*" others' activities.

154.    Det. Mills knew or should have known that insulting an officer cannot be grounds for charging a person with disorderly conduct.

155.    Chief Phipps and Deputy Chief Bellamy knew, or should have known, that Det. Mills's affidavit did not support the charge of disorderly conduct.

156.    Chief Phipps, Deputy Chief Bellamy, and Det. Mills willfully caused the arrest and detention of Gibbons with malice or a reckless and callous disregard for, and deliberate indifference to, his constitutional rights.

157.    It is clearly established that an official or another acting under the color of state law cannot deprive a person of due process and seize and detain his person without probable cause.

158.    It is also clearly established that an official or another acting under the color of state law cannot deprive a person of due process and seize his person in response to that person engaging in constitutionally protected activity, including gathering information about matters of public concern.

159.    At the time of Gibbons's arrest, a reasonable police officer or official with the same information available could not have believed that:

    a.    Gibbons's filming of Kingsport police was unprotected by the First Amendment;

    b.    Gibbons's posting videos critical of Kingsport police was unprotected by the First Amendment;

    c.    Gibbons's verbal criticism of Sgt. Dunworth was unprotected by the First Amendment;

    d.    Gibbons's verbal criticism of Sgt. Dunworth was disorderly conduct;

    e.    There was probable cause to arrest Gibbons; or that

    f.    There was probable cause to incarcerate Gibbons.

160.    The Individual Defendants' false arrest of Gibbons entitles Gibbons to declaratory relief and compensatory damages, including at least nominal damages.

161. Because the Individual Defendants' false arrest of Gibbons was malicious, oppressive, and in reckless disregard of Gibbons's clearly established Fourth Amendment rights, Gibbons is entitled to punitive damages against Defendants.

162. Defendant Chief Phipps is the final policymaker with respect to the Kingsport Police Department. *See* ¶¶ 16–19, *supra*.

163. Municipal liability can attach under *Monell*, 436 U.S. 658, for decisions made by a final policymaker. *See Pembaur v. City of Cincinnati,* 475 U.S. 469, 481 (1986).

164. Defendant Chief Phipps was aware of and sanctioned the actions taken against Gibbons in retaliation for his protected expression.

165. Defendant City of Kingsport is liable for the Individual Defendants' retaliatory conduct, entitling Gibbons to declaratory relief and compensatory damages, including at least nominal damages, against the City of Kingsport.

## FOURTH CAUSE OF ACTION
### Violation of Fourth Amendment—
### Malicious Prosecution (42 U.S.C. § 1983)
### (Against All Defendants)

166. Gibbons re-alleges and incorporates paragraphs 1–96 as if repeated here.

167. Defendants Chief Phipps, Deputy Chief Bellamy, Det. Mills, and Det. Horne made, influenced, and/or participated in the decision to arrest Gibbons.

168. Gibbons's initial arrest was without probable cause.

169.    Following dismissal of the speeding and unlawful use of a cell phone charges against Gibbons, the Individual Defendants' continued participation in the prosecution of Gibbons on the remaining disorderly conduct charge is without probable cause.

170.    The Individual Defendants' institution of criminal proceedings against Gibbons was intended to facilitate his arrest in evasion of Tennessee law prohibiting arrests for certain traffic offenses and intended as a means of retaliating against Gibbons for his protected expression.

171.    Det. Mills knew that Gibbons's words to Sgt. Dunworth at the drive-thru constituted speech protected by the First Amendment.

172.    Det. Mills knew that Gibbons's words to Sgt. Dunworth did not prevent the lawful activity of Sgt. Dunworth.

173.    Det. Mills knew that Gibbons's criticism of Sgt. Dunworth at the drive-thru did not prevent the lawful activity of the other patrons waiting in line.

174.    In fact, Det. Mills's affidavit in support of the arrest warrant alleged that Gibbons "disturbed" the lawful conduct of others, diverting from the language of Tennessee's disorderly conduct statute, which prohibits conduct that "*prevents*" others' activities.

175.    Det. Mills knew or should have known that insulting an officer cannot be grounds for charging a person with disorderly conduct.

176.   Chief Phipps and Deputy Chief Bellamy knew, or should have known, that Det. Mills's affidavit was baseless with respect to the charge of disorderly conduct.

177.   At the time of Gibbons's arrest, a reasonable police officer or official with the same information available could not have believed that:

a.   Gibbons's filming of Kingsport police was unprotected by the First Amendment;

b.   Gibbons's posting videos critical of Kingsport police was unprotected by the First Amendment;

c.   Gibbons's verbal criticism of Sgt. Dunworth was unprotected by the First Amendment;

d.   Gibbons's verbal criticism of Sgt. Dunworth was disorderly conduct;

e.   There was probable cause to arrest Gibbons; or that

f.   There was probable cause to incarcerate Gibbons.

178.   The prosecution of Gibbons caused Gibbons to suffer a deprivation of liberty apart from his initial seizure, including through transporting Gibbons to jail, jailing Gibbons, sentencing Gibbons to ten days in jail, and subjecting Gibbons to a long period of charges, which remain pending.

179.   The Individual Defendants' malicious prosecution of Gibbons entitles Gibbons to declaratory relief and compensatory damages, including at least nominal damages.

180.   Because the Individual Defendants' malicious prosecution of Gibbons was malicious, oppressive, and in reckless disregard of Gibbons's clearly established

Fourth Amendment rights, Gibbons is entitled to punitive damages against Defendants.

181. Defendant Chief Phipps is the final policymaker with respect to the Kingsport Police Department. *See* ¶¶ 16–19, *supra*.

182. Municipal liability can attach under *Monell*, 436 U.S. 658, for decisions made by a final policymaker. *See Pembaur v. City of Cincinnati,* 475 U.S. 469, 481 (1986).

183. Defendant Chief Phipps was aware of and sanctioned the actions taken against Gibbons in retaliation for his protected expression.

184. Defendant City of Kingsport is liable for the Individual Defendants' retaliatory conduct, entitling Gibbons to declaratory relief and compensatory damages, including at least nominal damages, against the City of Kingsport.

## PRAYER FOR RELIEF

WHEREFORE, Gibbons respectfully requests that this Court enter judgment against Defendants and issue the following forms of relief:

A. Declare that:

    a. Gibbons's filming of Kingsport police was protected by the First Amendment;

    b. Gibbons's posting videos of Kingsport police was protected by the First Amendment;

    c. Gibbons's verbal criticism of Sgt. Dunworth was protected by the First Amendment;

    d. Gibbons's criticism of Sgt. Dunworth was not disorderly conduct;

    e. Gibbons's arrest was without probable cause;

       f.     Defendants violated Gibbons's First and Fourth Amendment rights by soliciting a warrant for his arrest; and

       g.     Defendants violated Gibbons's Fourth Amendment rights by instituting and continuing his prosecution.

B.     Award nominal, compensatory, and other damages in an amount determined by the enlightened conscience of fair and impartial jurors;

C.     Award punitive damages against the Individual Defendants;

D.     Award reasonable attorneys' fees, statutory fees, and costs under 42 U.S.C. § 1988 and other applicable law; and

E.     Award such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Under Fed. R. Civ. P. 38, Plaintiff Joshua Gibbons demands a trial by jury on all issues so triable.

DATED: October 17, 2023

                        Respectfully submitted,

                        /s/ Matthew McClanahan
                        Matthew McClanahan, TN BPR No. 036867
                        MCCLANAHAN & WINSTON, P.C.
                        PO Box 51907
                        Knoxville, Tennessee 37950
                        Tel.: 865.347.3921
                        Email: matt@tennadvocate.com

                        Adam B. Steinbaugh*
                        Pa. Bar No. 326475
                        FOUNDATION FOR INDIVIDUAL RIGHTS
                          AND EXPRESSION
                        510 Walnut Street, Suite 1250

Philadelphia, Pennsylvania 19106
Tel.: (215) 717-3473
Fax: (267) 573-3073
Email: adam@thefire.org

*Application for admission
pro hac vice forthcoming.*

*Counsel for Plaintiff*
JOSHUA GIBBONS